[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. Introduction
The preliminary injunction sought by plaintiffs herein is apparently a matter of first impression involving issues such as whether and when local Planning Commission review is required under C.G.S. Section 8-24 as to "municipal improvements."
This consolidated matter concerns the efforts of five Orange residents who live on Lambert Road to enjoin all or part of extensive road modification construction that is about to or has just begun.[1] The court has required the parties to so shape the hearing as to try a potentially dispositive matter first and that threshold matter is whether the steps taken prior to review by the Orange Plan and Zoning Commission and prior to the onset of actual construction constitute a violation of General Statutes § 8-24.
In pertinent part, the statute provides: CT Page 5609
 "No municipal agency or legislative body shall . . . locate, accept, abandon, widen, narrow or extend any street, bridge, parkway or other public way . . . until the proposal to take such action has been referred to the commission for a report. Notwithstanding the provisions of this section, a municipality may take final action approving an appropriation for any proposal prior to the approval of the proposal by the commission pursuant to this section."
II. Outline of Arguments of the Parties
The plaintiffs claim that the Section 8-24 "commission" review,[2]
which took place at an open-to-the-public meeting on November 21, 2000, and at which plaintiffs were heard, took place too late to comply with Section 8-24. That is, certain actions are said to have occurred which ought not to have taken place "until the proposal to take such action [had] been referred to the commission for a report." General Statutes § 8-24. These prohibited-unless-reviewed actions are said to fall within the embrace of following phrases: "locate"; "acquire land";[3]
and, spend money (said to violate or exceed the bounds of the phrase "approving an appropriation").
Defendant Town asserts that a) these projects, which came to be combined, are not subject to Section 8-24 because they are being done by the State; b) if Section 8-24 review was required, it occurred in November, 2000, and fully complied with the law without any prior prohibited-without-review conduct; c) if the statute was applicable and was violated, subsequent ratification-type action by the Board of Selectmen, cured any defect.
III. Chronology of Events
The following facts are largely stipulated to by the parties or are so plainly documented as to have been found by the court.
• August 8, 1995 Town's application for a Local Capital Improvement Program (LoCIP) grant, in the amount of $120,000, was approved via letter to the Public Works Director of Orange, with regard to Marsh Hill Road and part of South Lambert Road. (Defendant's Exhibit A-A, Letter).
• August 6, 1996 Board of selectmen votes CT Page 5610 unanimously to approve the request of Public Works Director Lieberman to use $108,570.84 of Uncommitted LoCIP funds for the Marsh Hill Road project. (Defendant's Exhibit A-B, Board of Selectmen minutes.)
• October 18, 1996 Town entered into first agreement with Luchs Associates, Inc., a road design engineering firm, for engineering services for preliminary and final design plans, specifications and cost estimates for Marsh Hill Road and South Lambert Road. The contract price was $176,168. (Defendant's Exhibit A-D, Contract).
• February 27, 1997 A public informational hearing was held at Orange Town Hall, 7:00-9:00 p.m., with residents having opportunity to be heard. The topic was apparently Marsh Hill Road and South Lambert Road from Route 1 South to the Northerly end of State project 106-105. (Defendant's Exhibit A-E, Board of Selectmen minutes).
• March 12, 1997 Public Works Director Edwin Lieberman reports that an informational hearing on the Marsh Hill Road project was held. Next to occur is the preliminary design, and it was stated that a resolution "supporting the project" was needed. Resolution carried unanimously. (Defendant's Exhibit A-E, Board of Selectmen minutes)
• June 19, 1997 Preliminary design plans by Luchs Associates are submitted. (Plaintiff's Exhibit 7)
• December 17, 1997 A public hearing is held at Town Hall, Orange, "conducted by Town of Orange and Luchs Associates with the Assistance of the Connecticut Department of Transportation." The heading of the hearing transcript refers to State Project 106-112. (Defendant's Exhibit B).
• January 12, 1998 Luchs' design agreement is amended for design services to include CT Page 5611 improvements to the intersection of Lambert Road, South Lambert Road and U.S. Route 1, at an additional cost of $48,000. (Defendant's Exhibit A-D, Amendment to Contract).
• February 11, 1998 The Board of Selectmen unanimously adopted a resolution that the Marsh Hill/South Lambert Road project was in the best interest of the Town of Orange. (Defendant's Exhibit A-G, minutes).
• June 17, 1998 The Board of Selectmen held a special meeting at which the Board unanimously approved the proposed right of way agreement with the State subject to the Board of Finance appropriation of $47,500 for the town's share of project 106-112. The First Selectman noted that the State would like to go forward and a right of way agreement between the State and Town was needed. (Defendant's Exhibit A-H, minutes).
• July 23, 1998 Town entered into agreement with the State for rights of way activities in conjunction with road improvements, State Project 106-112, Federal Project STPN-2658(2). (Defendant's Exhibit A-I, Contract).
• September 15, 1998 A traffic study by DLS Consulting is published, entitled, "Traffic Study, Lambert Road, Town of Orange." (Plaintiff's Exhibit 11)
• November 5, 1998 Town submitted a check to the state for $47,500, in accord with contract referenced above, of July 23, 1998. (Defendant's Exhibit A-J, check and invoice).
• September 1, 2000 Town entered into agreement with State of Connecticut for the construction of the Marsh Hill/South Lambert road improvement project. The "whereas" clauses make clear, however, that project 106-111, re: the intersection of Lambert Road, Route 1 and South Lambert Road is embraced. (Defendant's Exhibit A-O, contract). CT Page 5612
• October 5, 2000 Victor and Richard Civie filed this action against the town.
• November 20, 2000 Town Engineer Lieberman requests a recommendation from the town Plan 
Zoning commission "in accordance with Section 8-24" to the Board of Selectmen on projects 106-112 and 106-111. (Defendant's Exhibit A-P, Memorandum).
• November 21, 2000 The Plan and Zoning Commission held a meeting, open to the public, and took up projects 106-111 and 106-112 by way of a requested Section 8-24 review. The Commission approved the projects, by a vote of 4-0. (Exhibit 17, minutes of Commission, and Exhibit 16, videotape of entire meeting).
• November 30, 2000 Formal notice of Plan and Zoning Commission's above decision published, having been filed with the Town Clerk on November 27, 2000. (Defendant's Exhibit A-Q).
• December 4, 2000 Letter for First Selectman Goldblatt, from the Chairman of the Town Plan 
Zoning Commission, notifying of the Commission's unanimous vote to approve and report to the Board its support of the projects pursuant to Section 8-24. (Defendant's Exhibit A-R, letter).
• December 13, 2000 At a regular meeting, the Board of Selectmen heard comments from residents then approved projects 106-112 and 106-111 and "ratified the prior acts of the board of selectmen as well as contracts entered into." (Defendant's Exhibit A-S, Board of Selectmen minutes).
• February 13, 2001 Concetta Riggione and Duane and Betsy Hipp filed their action against the town.
IV. Further Facts
The plaintiffs in each case appear to be primarily concerned with the more northerly of the two, basically consolidated, projects. As to this aspect, the following description is offered, largely dependent upon Plaintiff's Exhibit 4, a rough sketch. The Post Road (Route 1) runs CT Page 5613 essentially east and west. Perpendicular to it, coming south from the north, is Lambert Road, on which all plaintiffs reside. (Running south of Route 1, also perpendicular to it, is South Lambert Road. The intended road work, as to both Lambert and South Lambert, envisions each being widened, for apparent traffic flow purposes, a response to their purportedly too-narrow current status.
This "northerly" project, which bears the numerical designation 106-111, invades the "taking" of slices of real estate on the west side of Lambert Road by eminent domain. These takings involve a portion of a gasoline station, a telephone company office location and Orange's Public Works site (listed in a south to north order, all on the west side of Lambert Road's most southern end, just north of the Post Road. Additionally, although not at the heart of plaintiffs' concerns, a piece of restaurant property is being taken from the west side of South Lambert, just south of the Post Road.
The 106-111 aspect of the project proceeds north onto Lambert Road from the Post Road intersection with it. It extends for less than 400 feet which is 120 meters (see Defendant's Exhibit A-O, Contract), all to the south of where plaintiffs reside and involves widening to the west (or left if northbound) side. Lambert Road is currently in a two-lane configuration and the same number of Lambert lanes would result.
Essentially, as South Lambert Road approaches northward to the Post Road, it is intended that five lanes will exist. Two would be southbound. Two of three northbound lanes of traffic will be "must turn left" and "may go left or straight." The center lane of these two lanes will be the only lane permitting traffic straight through the Post Road intersection northward onto Lambert Road. Finally, the right northbound lane must turn right onto the Post Road.
This northbound approach to the Post Road, via Marsh Hill Road and South Lambert Road, is the only approach to the heavily developed Post Road from Interstate 95 in Orange.
The Town's effort to characterize the endeavors as State conduct includes reference to the following facts.
Public Works Director Lieberman received information from the South Central Region of Governments (C.O.G.) notifying him of the availability of non-municipal funds. Thus, the ball for submission of a desired project was concededly in the Town's hands. Yet, Connecticut Department of Transportation approval was a necessary step to further progress.
The Town. also put before the court, as to the notion that the public CT Page 5614 must be afforded an opportunity to be heard, that State policy requires a public hearing, and a public hearing pursuant to said policy was held, as noted, on December 17, 1997. Said policy is embodied in Defendant's Exhibit C, and is in purported compliance with C.G.S. § 13a-58.
All monies expended by the Town for design services with Luchs Engineering were reimbursed by the Local Capital Improvement Program (LoCIP) (non-municipal funds) and said reimbursement was known to be certain at the time of expenditure. (Testimony of Edwin Lieberman).
All condemnation or eminent domain proceedings ("takings") were accomplished by State legal action as reflected in the two takings evidenced in four exhibits (Plaintiffs' Exhibits 6, 12, 13 and 14). No Town monies were rendered to a private landowner nor to the superior court for a landowner's benefit. No title to any such property has come to the municipality. It is also true, however, that when the projects are completed, title will be transferred from the State to Orange. Also weighing against the argument of the Town as to the State-coloration of the projects is the fact that the Town was required to pay $47,500 for acquisition related matters (Defendant's Exhibit A-J) and, the parties further stipulated that if a landowner by legal process became entitled to further, higher remuneration, the Town would owe 10% of that, also.[4]
As of the date of the § 8-24 review, however, no taken land was acquired by the Town, nor at the time of trial, for that matter.
The Town has also asked the Court to note that the contract obliging the Town to pay $47,500 requires said payment for activities that go beyond acquisition. These include title search, appraisal, negotiation, and relocation assistance. (Defendant's Exhibit A-I, Agreement for Rights of Way Activities, re State Project 106-112, Federal Project STPN-2658(2), 6th "whereas" clause). It is to be noted, that the "whereas" clause referenced also states that "the municipality has requested that the State undertake all Rights of Way activities . . ."Id.
The Town is apparently empowered to bring about the cessation of the projects, with and/or without financial ramifications, depending upon whether the circumstances constitute "good cause" or not. (Id. at page 2, paragraph 4.) (See also, Defendant's Exhibit A-O, Agreement between the Town and the State for Construction, page 3, paragraph 10).
The State Department of Transportation has a significant measure of design and control of the projects. For example, the evidence includes the cover letter from D.O.T. to the Orange Director of Public Works, dated March 24, 2000, revealing that review has occurred and "design comments" are enclosed from the following D.O.T. units: Consultant CT Page 5615 Design; Soils and Foundations; Traffic Engineering; Bridge Liaison; Hydraulics and Drainage; District Office; Geometrics Unit; and Utility Section. (Defendant's Exhibit A-M). Additionally, three years prior, the Public Works Director reported to the First Selectman that a meeting with D.O.T.'s "Concept Team" made a change to the design of the New Marsh Hill Road by further straightening the road and thus necessitating the additional taking of private property. (Plaintiff's Exhibit 3).
The construction contract with the private company performing the projects is between the State and said company. (Defendant's Exhibit A-O).
The project was put out to bid to private contractors by the State.
Defendant's Exhibit A-O, an agreement between the Town and the State in September specifies that the Town's specific cost, of the $2,515,000 total cost of construction is zero.
Finally, although not part of a recitation of Town-urged facts in alleged support of its claim of State action, this opinion ought to set forth the manner in which the formerly separated projects came to be treated and reviewed for most purposes as one.
State project 106-111 (the northerly project) and project 106-112 (the southerly project), had separate beginnings. According to the testimony of Edwin Lieberman, the Town's Public Work's Director, project 106-111 represents a portion of the State's much larger project to widen and improve the entire Orange length of U.S. Route 1/Post Road. The State decided to schedule the work at the intersection of Post Road and Lambert Road/South Lambert Road (project 106-111) to coincide with project 106-112 in order to avoid two separate disruptions along the same roadways.
While project 106-111 appears to have had its genesis with the State's Post Road project, 106-112 was closer to having Town roots. Mr. Lieberman testified that soon after he became Public Works Director, he was visited by a representative of the South Central Region Counsel of Governments (C.O.G.) who notified him about funds available for municipal projects. Mr. Lieberman then checked the files for possible projects and recommended, to the Town's First Selectman, that the South Lambert Road/Marsh Hill Road improvements project would be a good candidate for these funds because it would tie in with the State's work at the exit 41/1-95 interchange. Mr. Lieberman testified that he could have taken any project to C.O.G., but the Town chose this particular one.
While Mr. Lieberman felt that the Town melded the two projects, 106-111 CT Page 5616 and 106-112, at the time the Town and State signed the construction agreement (Defendant's Exhibit A-O), September 1, 2001, other evidence makes clear to the court that the Town's involvement in the two projects and thus the unification of the two projects, occurred earlier. For example, the original contract with Luchs Associates, Inc., for engineering and design services in regard to South Lambert Road/Marsh Hill Road improvements, was amended in January 1998 to include design and engineering services in regard to the intersection of Post Road and Lambert Road/South Lambert Road.
V. Plaintiff's Claim that the Town has Illegally "Located" Priorto Commission Approval
As noted, plaintiffs have alleged that the Town has "located" the widening of a street without having made its submission to the commission. It is a bit difficult to know at first blush the nature of the legislature's usage of this phrase and in the room the arguable ambiguity leaves, plaintiffs urge an end of the spectrum closest to simply the selection of the spot. Thus, they contend, that the hiring and contracting with and paying a road design firm, Luchs Engineering, goes over the line of prohibition. There is no testimonial dispute that the Town contracted with and paid Luchs for the plans, drawings, specifications, etc. One question this poses for the court is whether there can be a meaningful or informative review by a planning commission without such a design effort as occurred here.
This court concludes that the legislature most likely did not intend to mandate a commission review prior to this sort of detailed professional design, and that the word "locate" is employed toward a place on the spectrum distant from the point plaintiffs choose, i.e., that "locate" in this context is a far more active verb, referring to the placing or setting down or actual accomplishment of the intended infrastructure goal.
It is also important to note that the statute does not say a municipality shall not "locate" a widening, narrowing or extension of a street without commission approval. It says instead that the Town shall not "locate, . . . widen, narrow or extend any street" without such prior review. Thus, the rule sets out a list of prohibited projects more probably than it sets out a series of steps within one.
The plaintiffs' argument that the legislature's use of "locate" is more akin to the mere selection of a location is further undermined by the legislature's inclusion of permissive language as to what can be accomplished before a planning commission's review under Section 8-24. In pertinent part, the statutes reads: "Notwithstanding the provisions of CT Page 5617 this section, a municipality may take final action approving an appropriation for any proposal prior to the approval of the proposal by the commission pursuant to this section." This expressly permits a municipality to proceed in the planning process, at least far enough to finalize and appropriate a budget for the project, before obtaining approval. Since choosing a site is typically an unavoidable step in determining the cost of a project, the statute must be interpreted to enable a municipality to proceed with choosing and designing a site before making a reference to the planning commission.
Also weighing slightly against plaintiffs' notion that a project may well have plural preliminary junctures mandating a trip to the commission is the fact that in earlier formulations, in language now abandoned, more support for said idea once existed. Consider: "No action shall be taken by any municipal agency on any proposal involving the location, acceptance, widening", etc. (going on to then track current language) general Statutes § 857 (1947). This earlier language is far closer to the don't-make-a-move-without-submission interpretation plaintiffs would have the court apply to current phrasing. ("No . . . agency shall locate, accept, abandon, widen, etc.)
The court must reject this argument of the plaintiffs.
VI. Plaintiff's Claim That the Town Has Violated Section 8-24 byAcquirinq Land for the Projects
The plaintiffs point to roadside "takings" of private property. Further, plaintiffs alert the court to the fact that as to said acquisitions (whether a mere right of way or title was sought) the Town was obliged to spend money, under a formula to which it must contribute 10% of such costs. Here, as noted, the Town paid $47,500 to the State.
For purposes of this "acquire land" alleged violation, the financial aspect alluded to shall be treated in the next section, where the central claim is the allegedly illegal spending of money without commission review.
The prohibition against acquiring land is not found in the first section of 8-24 which relates to locating, accepting, abandoning, widening, narrowing or extending any street, bridge, parkway or other way.
Instead the prohibition resides only in the second section with regard to airports, parks, playgrounds, schools or other municipally owned property.[5]
CT Page 5618
One indication that these end goals are not just part of a sloppy run-on sentence into the middle of which section (2) was dropped and that the reasons these sentences are rather clearly intended or can be seen to be truly separable from one another reside in the fact that each (of four) sections begins with the word "locate". Other separate words new to this section are used before the airport, building, playground list, also, such as "relocate" and "substantially improve".
This clear separability does not mandate any further excursion into principles of statutory construction. The curious student might ask, however, why it appears to be so that acquiring land for airports, parks and playgrounds requires commission approval while that for widened roads does not. The rationale most likely, but which this court need not decide, given the clearly distinct sections, is that takings for road improvements were generally deemed to be clearly more incidental to such an effort than obtaining a place to build an airport, park or school.
Continuing on the theme that only section (2) of Section 8-24 prohibits un-reviewed "acquiring land for" airports, parks, playgrounds, schools or other municipally owned property or public buildings, and the above thought that street-related land acquisition was deemed more likely incidental than the section (2) land acquisitions, is the fact that brand new roads are a rarity in these times on land not already State or Town owned. Thus, the need to prohibit un-reviewed acquisitions of land for road purposes was not as likely to be of serious concern, at least as compared to that, necessary to airports, parks, playgrounds, etc., where obtaining the land is a clearer essential to the project. The singular exception to notion of the rarity of land acquisitions for new roads is with regard to such roads in private residential developments, a common occurrence. In that regard, a separate and distinct lengthy and specific statutory scheme immediately follows the one examined here, i.e., Section8-25, et seq.
Thus, it becomes logically apparent that the legislative desire for commission review regarding land acquisition was more likely for the list of projects in Section (2) than for the road work which is the focus of Section (1).
Plaintiffs urge the court to bring this Section (2) prohibition regarding land acquisition into the Section (1) must-be-reviewed-first activity list via the phrase "or other municipally owned property or public building." That is to say that plaintiffs, in ostensible recognition that if they fail to move the "acquire land" restriction into the street section, Section (1), they should have this court read into Section (2) the street rubric, as if within the phrase "other municipally owned property." This the court believes to be a stretch, an invitation CT Page 5619 that should be declined. First, the legislature demonstrates that it knew how to describe road work, having done so scant words earlier. It need not have used a new and quite oblique reference to do so. It is almost certainly more likely that the phrase "or other municipally owned property or public building" was something of a final catchall device added to the list which immediately precedes it (airport, park, playground, school . . .). The legislature wisely avoided falling into the trap of listing every conceivable purpose (skating rink, swim pond, open space, teen center, stadium, etc.) without a catchall and risk missing one that could then go unreviewed for the omission.
VII. Plaintiffs' Claim that the Town Illegally Spent Money Without PriorCommission Approval
Plaintiffs' final claim is that there is a prohibition against spending money without prior Commission approval. The thrust of this claim has already been rejected by the court's response to plaintiffs' arguments on location (Section V, herein) and acquiring land (Section VI, herein). That is to say, essentially, that design costs did not constitute an act of "location" needing approval and, further, that costs, which were 10% of land acquisition costs, were not prohibited by the roads section (1) of Section 8-24. These are the only two areas in which allegedly prohibited spending of funds occurred.
In this general regard, however, plaintiffs argue that the language which allows the Town, before Commission review, a final approval of anappropriation is a barrier to expenditures. The notion is that this language means a town may finally appropriate but not spend "for any proposal prior to the approval of the proposal by the Commission. . . ."
Plaintiffs, in ostensible support of this proposition, offer the remarks of Senator Consoli to the effect that this language is a curb upon unreviewed spending. Section 8-24 has been amended several times with the latest substantive changes occurring during the 1985 legislative session. The plaintiffs referred to the legislative history from this session, specifically the comments of Senator Consoli, as evidence of the legislature's intent that a municipality not spend funds on a project until after the planning commission's review. In his introduction to the bill, Senator Consoli mentions that the revision extends the review of the planning commission to include projects substantially improving municipal property, projects locating or extending public utilities or terminals, and projects extending public housing developments, redevelopments or urban renewal projects. He goes on to describe the revision as excluding from commission review projects for maintenance and repair of existing property. The language pertinent to the plaintiffs' argument appears later in the legislative history when Senator Consoli CT Page 5620 responds to a question from another senator on further amendment to the statute saying: "[W]hat this language does is simply permit a municipality to make appropriations prior to final approval by the commission and what it does is it offers safeguards, having done so, that the people in the municipality can counteract a misdirected appropriation." 28 S. Proc., pt. 6, 1985 Sess., p. 2013. However, there is nothing in the Senate's legislative history to suggest that the legislature intended to mandate that a municipality make an appropriation before review or which expressly prohibits all or any spending on a project before the commission's review.
This court cannot conclude that the legislature attempted to list in certain detail all manner of prohibited-without-review conduct and then throw over them a blanket that renders spending illicit regardless of the purpose. This court has already ruled that the "location" restriction does not apply to design work and that the land acquisition prohibition does not even reside in the section of 8-24 regarding streets.
More likely, the legislature was simply stating that "proposals" need not be brought to a Commission if they remain in a posture where Town acquiescence (i.e., with an apprnved appropriation) is not yet at hand. It is as if the legislature were content to tolerate "grand review" rather than microstep review and this conclusion is clearly in line with the legislative history plaintiffs cite.
It has been noted at the outset that these matters appear to be of first impression. The signal cases involving court invalidation of a project were with regard to projects never submitted at all to Commission review. Another judicial invalidation involved a project approved by the Commission but then altered sufficiently that another review was deemed necessary but which was not sought. The case law of the general field is collected and described in Appendix A, attached hereto.
VIII. The Sufficiency of The Section 8-24 Review Conducted
Plaintiffs urge that the Section 8-24 review occurred too late for meaningful substantive review, although they have not specifically argued that this constituted no review at all. While the court has determined that no Section 8-24 violation preceded this review, the court has scrutinized the open meeting of the Plan and Zoning Commission held on November 21, 2000 in order to assess both of these notions. This involved a review of the minutes (Plaintiffs' Exhibit 17) and a viewing of the videotape which seems to approach or exceed two hours in length. (Plaintiffs' Exhibit 16)
At the open meeting, all of the three witnesses who appeared at this CT Page 5621 injunction hearing also appeared, spoke and took questions from the public and Commission members. (Edwin Lieberman, Town Engineer and Public Works Director; Mitchell Goldblatt, First Selectman; and Doran Dagan, design engineer and partner in the Luchs engineering firm). After these three spoke and provided information about the projects, the Chairman opened the floor to the comments and questions of townspeople. Three of the plaintiffs in this matter featured heavily in this aspect of the hearing, which may have consumed an hour. The Commission then turned to entertain questions by the Commissioners, posed to the Town Attorney, Brian Stone (who also attended this court's injunction hearing), the First Selectman and the design engineering consultant. In all, approximately ten citizens spoke, nine of whom opposed the Lambert Road aspect of the endeavor. In all, four of the plaintiffs spoke and later questioned. Each of the Civie brothers and Mr. Hipp appeared at least twice. Citizens from the following Lambert Road addresses were heard: 320 (Civies), 326, 760, 391 and 691. The Hipps are from 384 Lambert Road. Additionally, a traffic engineer from the University of Connecticut, introduced by Richard Civie, spoke twice.
When the Chairman turned the meeting over to the Commission for questions and comments of the officials and the consultants, more questions and comments came from the citizens and were civilly tolerated. Virtually all of the exchange in every section of the meeting centered upon Lambert Road.
It is fair to characterize much of the opposition commentary as heavily opposed to current heavy traffic on this lower classification, two lane, local road, laced with opinions that the projects at hand will worsen matters. No one opposed the project in its reaches south of the Post Road.
At least two of the Commissioners, including the Chairman, expressed their willingness to assist the Lambert Road opponents in the future, even if in a forum other than before this Commission.
The court cannot accept the claim that the Section 8-24 review was without substance. To the contrary, it was a fairly intensive review of a matter with which most Commissioners seemed fairly familiar. (Indeed, the Town's new Plan, adopted in late 1999, recommended the bulk of this project. See Plaintiffs' Exhibit 15, and, e.g., page 50 therein.)
It is true that the Commissioners also expressed concern about and seemed influenced by the potential of what was seen as a negative ramification of a Commission report objecting to all or a portion of the project. They believed the project would likely "go to the end of the line" for the very substantial financial assistance scheduled if they CT Page 5622 reported out in opposition or partial opposition.
It was also noted, however, that there was a sense of inevitability that weighed against an effort to slice off the Lambert Road facet. That notion partially rested in the apparent fact that the State, in what is said to be an even more purely State project, is improving the entire Post Road stretch from Milford to West Haven, that is, through the entirety of Orange. The view was expressed that the State has the power and desire to Lake each intersection appropriately fit the "new" Post Road which would or could readily see an alteration of lower Lambert Road in any event.
The court must reject the argument made against the extent and quality of the Section 8-24 review by the Commission. (The ultimate report of the Commission was forwarded to the Board of Selectman on November 27, 2000 (Defendant's Exhibit A-R).
IX. The Arguments of the Town
The disposition of the plaintiffs' claims makes it unnecessary, strictly speaking, to address two of the Town's arguments. These are 1.) The November, 2000 Commission open meeting occurred absent any prohibited-without-review prior conduct; and 2.) That the post-hearing "ratification" by the Board of Selectman cured any defect.
A few remarks, however, about the Town's earliest argument might be in order, though they are dicta. The Town has urged that the entire statutory scheme embodied in Section 8-24 is not here called into play because the projects are State projects. Earlier this opinion set forth, in Section IV, those facts which the Town claimed supported a conclusion that these were State endeavors. This court believes there is sufficient Town related impact and conduct to invoke the spirit of the likely legislative intent that the Commission review for fidelity to the Town Plan. The expansion of at least two Town roads and their intersections with a major road (albeit a State road) ought not generally be left solely to the Department of Transportation's policy of offering early public comment. A primary reason no hearing was mandated here was that no overall expenditure on the needs of a "final action approving an appropriation" had to occur. (The other two types of actual expenditures, as noted, were not in regard to prohibited conduct.)
Obedience to the obvious legislative intent would probably require that a municipality look to the broad place in the temporal chronology when commitment of funds would be required were Town funds those to have been required. This would suggest review at least before bids on the work were sought or at least awarded. It is difficult, especially in dicta, to pick CT Page 5623 through the minefield of literally dozens of junctures at which someone takes some action at regional, local, state and federal levels, and the judiciary is not charged with doing so. The review here was not, strictly speaking, statutorily too late, but it was submitted to the Commission for the wrong reasons and absent plaintiffs' intervention would not have occurred at all.
Aside from the minor weight which the dicta above can be accorded, the court expressed these thoughts lest it be erroneously inferred that a project of this kind, state-involved as it has been, requires no review for the reasons above. This court has not so held.
X. Conclusion
Although this court has determined that the plaintiffs have not met their burden of proving a violation of Section 8-24 for the purpose of obtaining an injunction, a review of the plaintiffs' sought relief and the burden of proof for such relief is appropriate nonetheless.
The standard plaintiffs must meet in order to obtain injunctive relief is a high one. "It is clear that the power of equity to grant injunctive relief may be exercised only under demanding circumstances. . . . Restraining the action of an individual or corporation by injunction is an extraordinary power, always to be exercised with caution, and never without the most satisfactory reasons." (Citation omitted; internal quotation marks omitted.) Anderson v. Latimer Point Management Corp.,208 Conn. 256, 262, 545 A.2d 525 (1988). Furthermore, the court must exercise even greater caution when enjoining the action of a government official or agency. Courts will act with extreme caution when the granting of injunctive relief will result in interference with or embarrassment to the operations of government. See, Wood v. Wilton,156 Conn. 304, 310, 240 A.2d 904 (1968).
Despite the court's disposition on the issue of the alleged violation of General Statutes Section 8-24, the plaintiffs' case may not be over as the court must weigh, and then possibly try, as an injunction matter, allegations of nuisance. Given the evidence, testimony and argument submitted during the initial phase of the case, the court foresees that the plaintiffs will focus on the area of Lambert Road, north of Route 1, and will seek to enjoin the road work now scheduled to occur there.
In this next phase, the plaintiffs face a challenge that may be steeper than that they have already faced. Not only must they prove that a nuisance will be caused by the town and its involvement in the road improvement projects, but also the additional elements required in a common law injunction case. "[A] party seeking injunctive relief has the CT Page 5624 burden of alleging and proving irreparable harm and lack of an adequate remedy at law." Johnson v. Statewide Grievance Committee, 248 Conn. 87,107, 726 A.2d 1154 (1999). This the court must measure against the investment of both the town and the state, and ultimately their citizens, in these projects. "An injunction is an extraordinary remedy which is not mandatory, but is left to the court's sound discretion even if there is a proper showing of irreparable harm." Demers ExpositionServices, Inc. v. Porter, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 466718S (September 12, 1995, Goldberg, J.).
For the reasons stated in preceding sections, the injunctive relief sought by the plaintiffs on Section 8-24 grounds is denied.
Nadeau, J.